UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPE FITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL–CIO,

v.

INTERNATIONAL MAINTENANCE COMPANY.

No. CIV.A. 02–CV–635.

United States District Court,
M.D. Louisiana.

Oct. 25, 2002.

See, also, 251 F. Supp.2d 1310, 2003 WL 1398194.

Louis L. Robein, Jr., Robein, Urann & Lurye, Metairie, LA, for Plaintiffs.

William R. D'Armond, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA, for Defendants.

1. Jurisdiction will be discussed in greater detail in the appropriate section below.

2. The court notes here that "[a]ll material facts set forth in the statement required to be

## RULINGS ON MOTION TO CONFIRM CONTRACTUAL GRIEVANCE AWARD AND ON MOTIONS FOR SUMMARY JUDGMENT

JOHN V. PARKER, Chief Judge.

These matters are before the court on a motion and amended motion to confirm contractual grievance award by United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO ("UA"), plaintiff, against defendant, International Maintenance Company, L.L.C. ("IMC") (docs. 2 and 15); a motion for summary judgment by defendant against plaintiff (doc. 9); and a cross-motion for summary judgment by plaintiff against defendant (doc. 25). All motions are opposed. Jurisdiction is based upon the Labor Management Relations Act ("LMRA"), § 301, 29 U.S.C. § 185.[1]

### FACTS AND PROCEDURAL HISTORY

The following facts material to IMC's motion for summary judgment now before the court are taken from the Statement of Material Facts submitted by defendant (doc. 10). The court allows these facts to serve as its own statement of the case.[2] Plaintiff's exceptions to certain paragraphs are noted where appropriate (doc. 26):

1. IMC is a general contractor engaged in the industrial construction and maintenance business. It is part of the Turner Industries family of companies.

2. IMC has had a contract with W.R. Grace & Company since 1983 to perform maintenance services at the

served by the moving party will be deemed admitted, for the purposes of the motion, unless specifically denied." LR56.2M.

W.R. Grace industrial plant in Lake Charles, Louisiana. The hourly employees on that job are covered by a collective bargaining agreement between IMC and fourteen building and construction trades unions. The general presidents (international presidents) of each of these unions, or their designees, form what is known as the General Presidents' Committee. On behalf of the international unions, the Committee enters into labor contracts with various contractors who do industrial maintenance work. These contracts are entered into on a job site by job site or "project" basis. These contracts are known as "General Presidents' Agreements." The ones applicable to work performed within Louisiana are commonly referred to as "Orange Books," and the ones applicable to job sites outside of Louisiana are commonly referred to as "Blue Books." These nicknames derive from the color of the paper on which the contracts are printed. Since 1983, IMC has had an Agreement, or "Orange Book," covering its work at the W.R. Grace Facility in Lake Charles. The local unions of the signatory international unions are not parties to the collective bargaining agreement and do not participate in its negotiation. They do, however, play a role in the administration of the contract, including the processing of grievances.

3. The Agreement contains a grievance and arbitration procedure in Article VII. Step I is a meeting between the aggrieved employee and/or his onsite union representative (union steward) and the employee's immediate supervisor. Step II is between an international union representative and the contractor's labor relations manager. Step III calls for a decision by the Committee. There are no company representatives on the Committee; it is comprised solely of union representatives. Step IV is impartial arbitration under the procedures of the FMCS.

Plaintiff excepts to this paragraph, to the extent that it refers to the fact that the Committee is composed solely of union representatives. Plaintiff maintains that such statement is irrelevant and immaterial.

4. The grievance and arbitration procedure in the collective bargaining agreement is as follows:

1. All grievances that may arise on any work covered by this Agreement must be filed within five (5) working days after the occurrence of events giving rise to the grievance, and shall be handled in the following manner:

*Step I:*

Between the aggrieved employee and/or the on-site Representative and the employee's immediate on-site Staff Supervisor. It is understood that the on-site Representative shall have permission to phone the office of the Administrator of the General Presidents' Maintenance Committee for guidance in any situation that may arise during working hours. On grievances involving disciplinary action against employees or disputes relative to local wages and fringe benefits applicable under this Agreement, a representative of the Local Union shall be included in Step I.

*Step II:*

Between an International Union Representative and the Labor Relations Manager of the Contractor.

*Step III:*

1. If the grievance is not satisfactorily settled within five (5) working days after the start of Step II, the infor-

mation prepared for Step II plus any other supplemental information, facts, or positions developed in Step II shall be submitted in wiring to the General Presidents' Committee within five (5) days.

2. The General Presidents' Committee shall render its decision with[in] ten (10) days after receipt of the grievance from Step II. In the event that the affected Union or Contractor does not accept the decision of the General Presidents' Committee, either party may appeal within ten (10) days to an Impartial Arbitrator.

*Step IV:*

1. Within five (5) days after the grievance has been referred to Step IV, the parties shall apply to the United States Mediation and Conciliation Service for the services of an Arbitrator in accordance with established rules of said services. The Impartial Arbitrator shall only have jurisdiction and authority to determine the meaning, application of, or compliance with the provisions of this Agreement and shall not have jurisdiction or authority to add or detract from or alter in any way such provisions.

2. In arbitration proceedings, the expenses of the Impartial Arbitrator shall be shared equally by the parties.

3. The findings of the Arbitrator shall be binding on both parties.

5. McKnight was employed by IMC on the W.R. Grace Facility as a pipefitter. On August 16, 2001, he was discharged for violation of company policy—specifically, falsification of documents at hire.

Plaintiff excepts to this paragraph. While plaintiff does not dispute the fact that McKnight was discharged, the UA notes that the reason given on the Termination Notice was "failure to disclose preexisting back condition on second inquiry form." In addition, plaintiff regards this assertion as immaterial.

6. On August 21, 2001, Local 106 notified IMC by facsimile that it was filing a Step I grievance protesting the discharge of McKnight.

7. On August 24, 2001, the Step I meeting was held, the grievance was discussed, but no agreement was reached.

8. On August 27, 2001, Local 106 notified IMC by facsimile that it was advancing to Step II.

9. On September 10, 2001, a Step II meeting was held, but no agreement was reached.

10. On October 1, 2001, UA moved the grievance to Step III—the Committee level.

11. On October 1, 2001, Kaczorowski,[3] Administrator of the Committee, notified IMC by facsimile that the matter had been placed on the agenda for the regular Step III meeting of the Committee to be held at 9:00 a.m.

**3.** A reference to William P. Kaczorowski, who is employed by the Building and Construction Trades Department of the AFL–CIO as Administrator of the Agreement. As Administrator of the Agreement, Kaczorowski is responsible for facilitating the smooth and proper functioning of the Agreement. His duties include corresponding with the labor relations representatives of signatory contractors; appointing a union job site representative for each project covered by the Agreement; notifying affected parties of the Committee meetings and decisions; monitoring and ensuring compliance with the Committee decisions and the terms of the Agreement; and performing such other administrative tasks as are assigned to him by the Committee.

Wednesday, October 10, 2001, at the IBEW offices in Washington, D.C.

12. On October 10, 2001, Guitreau and McCall appeared at the IBEW offices in Lake Charles for the Step III meeting. McCall had misread the notice of the Step III meeting and erroneously thought that the meeting was to be held in Lake Charles. When the error was discovered that morning, Guitreau faxed a letter to the Committee stating that he had missed the meeting, denying the grievance, submitting some basic documents, and stating that he was out of town but "will talk with you in a couple of days to arrange another meeting."

Plaintiff excepts to this paragraph. Guitreau's letter and its attachment were sent by facsimile to Kaczorowski, whose office is in a different building in Washington, D.C. from where the Step III meeting was held. To the extent that defendant's Statement of Facts implies that the Committee timely received Guitreau's letter and documents, plaintiff notes that the Administrator did not discover Guitreau's facsimile until he returned to his office after the Step III meeting had concluded. Moreover, plaintiff asserts that these statements are immaterial.

13. On October 10, 2001, Guitreau was notified that the Committee had gone forward with the case and had upheld UA's grievance.

14. On October 10, 2001, Guitreau faxed another letter to the Committee stating that its decision "is not acceptable," and that "we can either present our facts at a rescheduled third step or we can proceed to arbitration."

Plaintiff makes the same exception as that made to Paragraph 12, and notes that Guitreau's second facsimile was sent to the Administrator at his office,

after the conclusion of the Committee meeting.

15. On October 16, 2001, the Committee notified IMC and UA in writing that the Committee had sustained Local 106's grievance and ordered McKnight reinstated with back wages and benefits from August 16, 2001, the date of discharge.

16. On October 29, 2001, the Committee wrote to IMC, referred to the contract provisions dealing with arbitration, and stated that it was forwarding a copy of Guitreau's letter (no date mentioned, but reference was to second October 10 letter) to Local 106 "notifying them of your decision to proceed to arbitration."

17. In an undated letter whose context indicates that it was sent in late November, Local 106 notified UA that it had spoken with Guitreau by telephone on November 20 and that Guitreau said that IMC was not going to pay back wages and doctor bills "without an arbitration ruling." The Local 106 representative also stated in this letter that "I have yet to be contacted on choosing an arbitrator."

Plaintiff excepts to the contents of this paragraph in its entirety, as its statements are immaterial.

18. On November 26, 2001, UA wrote to the Committee, enclosed the letter from Local 106, and took the position that "IMC did not contest the decision in a timely manner" and requested that the Committee enforce its decision.

19. On December 3, 2001, the Committee wrote to IMC and stated that "you have one of two choices, either reinstate Mr. Dennis McKnight with back wages or *IMMEDIATELY* proceed to arbitration."

20. On December 3, 2001, IMC wrote to Local 106 stating, "This will notify you that International Maintenance Company, L.L.C. will proceed to arbitration to settle this issue with Dennis McKnight." The letter concluded, "If you need any further assistance, please let me know. I can be reached at (337) 882–5811."

Plaintiff excepts to the contents of this paragraph in its entirety, as its statements are immaterial.

21. On December 14, 2001, the Committee wrote to IMC stating that the "time limits for filing the arbitration is long passed" and therefore "IMC is required to reinstate Mr. McKnight with back wages as per the directive dated October 29, 2001." This letter was addressed to Dwight Braud as President of IMC. Braud is a vice-president.

22. Neither IMC nor UA took any further action to move the case to arbitration after December 14, 2001.

23. Although the Agreements provide for arbitration, it is unusual in the construction/maintenance industry for a dispute actually to go as far as arbitration. IMC has never had an arbitration arising under the Agreement at the W.R. Grace Facility or any other job site. As a result, there is no established practice or custom between the parties as to who writes to the FMCS for a panel of arbitrators.

Plaintiff excepts to the defendant's statement that "it is unusual in the construction/maintenance industry for a dispute actually to go as far as arbitration" as immaterial and irrelevant, to the extent that IMC makes a general statement that applies to parties not involved in this lawsuit or to a collective bargaining agreement other than the Agreement.

Plaintiff also excepts to the defendant's statement that "there is no established practice or custom between the parties as to who writes to the FMCS for a panel of arbitrators." Plaintiff asserts that under the Agreement, it is the historic and accepted norm that if a party receives an unfavorable decision at any step in the procedure, that party bears the burden of moving the grievance to the next step in the procedure or abiding by the decision.

In the specific Step III/IV context, plaintiff asserts that a party that has lost before the Committee at Step III, and who seeks to appeal to Step IV arbitration, will formally state its intent to appeal to arbitration and thereafter take the initiative to secure FMCS-sponsored arbitration.

The following facts material to UA's motion for summary judgment now before the court are taken from the Statement of Material Facts submitted by plaintiff (doc. 27). The court allows these facts, in conjunction with IMC's facts, to serve as its own statement of the case. Defendant's exceptions to certain paragraphs are noted where appropriate (doc. 31):

1. UA is an unincorporated labor organization within the meaning of 29 U.S.C. § 152(5), with its principal place office in Washington, D.C.

2. The Agreement is a collective bargaining agreement between international building and construction trades unions and signatory industrial service contractors. The Agreement is a national agreement that covers ongoing maintenance, repair, and renovation work in plants, industrial facilities, utility installations, and other facilities. The standard form of the Agreement has been implemented at projects throughout the United States. In various parts of Louisiana, however, a

version of the Agreement has been applied that is somewhat different from the standard form. Known as the "Orange Book" Agreement, it applies in Baton Rouge, Lake Charles, New Orleans, Shreveport, and the northeastern part of Louisiana.

3. IMC is a company organized and existing under the laws of Louisiana. IMC is the service contractor providing labor services and performing work at the W.R. Grace Facility in Lake Charles. IMC performs maintenance services at the W.R. Grace Facility pursuant to the terms of the Orange Book Agreement.

4. The Committee consists of the General Presidents of the international unions signatory to the Agreement or their representatives. The Committee bears responsibility for administering and interpreting the Agreement. In the Agreement, the Committee's broad authority in this regard is memorialized at Article VI(6). The Agreement also confers upon the Committee the specific task of deciding grievances under Step III of the Article VII grievance procedure.

5. Article VII of the Agreement contains a four-step grievance and arbitration procedure for the resolution of workplace disputes. Step I of the procedure calls for resolution of the dispute between the aggrieved employee (and/or the employee's union steward) and the employee's immediate supervisor. Adjustment of a grievance at Step II is between an International Union Representative and the Labor Relations Manager of the Contractor. Step III provides for submission of the dispute to the Committee for consideration and decision, and allows for appeal of the Committee's decision to an Impartial Arbitrator within ten days. Step IV permits an application to the FMCS for the services of an arbitrator within five days of the referral of the grievance to Step IV.

6. Article VII, Step III of the grievance procedure provides in relevant part:

   1. If the grievance is not satisfactorily settled within five (5) working days after the start of Step II, the information prepared for Step II plus any other supplemental information, facts or positions developed in Step II shall be submitted in writing to the General Presidents' Committee within five (5) days.

   2. The General Presidents' Committee shall render its decision with[in] ten days after receipt of grievance from Step II. In the event that the affected Union or Contractor does not accept the decision of the General Presidents' Committee, either party may appeal within ten (10) days to an Impartial Arbitrator.

Article VII, Step IV provides in relevant part:

   1. Within five (5) days after the grievance has been referred to Step IV, the parties shall apply to the United States Mediation and Conciliation Service for the services of an Arbitrator in accordance with established rules of said services.

7. A party that has lost before the Committee at Step III, and who seeks to appeal to Step IV arbitration, must formally state its intent to appeal to arbitration and thereafter take the initiative to secure FMCS-sponsored arbitration. This Step III/Step IV appeal process is governed by the time limits set forth in Article VII (i.e., referral to Step IV by submission of appeal within ten days and then application to the FMCS within five days of referral to Step IV).

Defendant excepts to the plaintiff's statement that a party who has lost before the Committee at Step III and seeks to appeal to arbitration "must formally state its intent to appeal to arbitration and thereafter take the initiative to secure the FMCS-sponsored arbitration." Defendant argues that the contract specifically provides that "the parties," not the party losing at Step III, shall apply to the FMCS for the services of an arbitrator. IMC does not know what plaintiff means by "formally state its intent to appeal the arbitration;" the contract merely says that the party who loses at Step III "may appeal within ten (10) days to an Impartial Arbitrator."

8. McKnight was a bargaining unit employee employed by IMC at the W.R. Grace Facility. On August 16, 2001, IMC terminated McKnight from employment for alleged "violation of company policy" and "failure to disclose preexisting back condition on second injury form."

9. On McKnight's behalf, Local Union 106 of the UA initiated a grievance under Article VII, challenging his termination. The grievance proceeded through the first two steps of the grievance procedure without resolution.

10. On October 1, 2001, the UA submitted the grievance to Step III of Article VII. By letter dated October 1, 2001, the Administrator of the Agreement notified IMC that the Step III grievance of McKnight had been placed on the agenda for the Committee meeting to be held on October 10, 2001. The Administrator's letter specifically stated that the meeting would be held in Washington, D.C., and set forth the address at which the meeting would take place. In addition, the letter invited IMC to attend the meeting or to submit the Company's position in writing for consideration by the Committee.

11. The Committee reviewed the Step III grievance involving the termination of McKnight on October 10, 2001 in Washington, D.C. The UA contended that there was no violation of company policy and that IMC did not discharge the employee for "proper cause."

12. No representatives from IMC attended the meeting, and IMC failed to submit its position in writing or provide any materials for the Committee's consideration in time for the Step III meeting on October 10, 2001.

13. The Committee reviewed the arguments and evidence that were timely submitted to it for the Step III meeting regarding the McKnight grievance and concluded that the McKnight was meritorious. After the Committee meeting, Guitreau contacted the Administrator who informally notified Guitreau of the Committee's decision by telephone. Later that day, Guitreau faxed a letter to the Administrator in which he stated that "[t]he General Presidents' Committee's decision is not acceptable and we can either present our facts at a rescheduled third step or we can proceed to arbitration." His letter also stated, "I'll await word from you as to your decision."

14. After hearing arguments from the UA and examining the evidence submitted, the Committee sustained the grievance and ordered McKnight reinstated with back wages and benefits from August 16, 2001.

15. By letter dated October 16, 2001, the Administrator informed the UA and IMC of the Committee's decision and order to reinstate McKnight with back pay and benefits. IMC did not

file a formal appeal within ten days of the Committee's written decision as required by Step III of the grievance procedure.

Defendant excepts to the plaintiff's statement that "IMC did not file a formal appeal within ten days of the Committee's written decision as required by the Step III of the grievance procedure." On the day Guitreau was notified by telephone of the Committee's decision, he faxed a letter to the administrator of the Committee stating that the decision was not acceptable and that the company could either present its facts at a rescheduled third step or "we can proceed to arbitration." Defendant contends that this constituted an appeal to arbitration. There is no requirement in the contract, according to IMC, that it await the receipt of a letter reporting the decision before it files an appeal.

16. By letter dated October 29, 2001, the Administrator reminded IMC of the contractual requirements for perfection of appeal. IMC took no steps to process the grievance to arbitration after it received the October 29 letter.

Defendant excepts to the plaintiff's statement that "IMC took no steps to process the grievance to arbitration after it received the October 29 letter." Such steps were unnecessary, according to IMC, because it had previously appealed to arbitration.

17. On November 26, 2001, the UA informed the Administrator by letter that IMC was refusing to comply with the decision of the Committee and that IMC had not contested the decision in a timely manner pursuant to Step IV of Article VII. The UA requested enforcement of the decision and award of the Committee, and attached a letter from Local 106 informing the UA of IMC's defiance of the Committee's ruling.

18. By letter dated December 3, 2001, the Administrator informed IMC that it must "either reinstate Mr. Dennis McKnight with backpay or *IMMEDI-ATELY* proceed to arbitration." IMC did not proceed to arbitration by applying to the FMCS for the services of an arbitrator within five days of the Administrator's letter.

Defendant excepts to the plaintiff's statement that "IMC did not proceed to arbitration by applying to the FMCS for the services of an arbitrator within five days of the Administrator's letter." IMC argues that this statement confuses two things—the appeal to arbitration and the request to the FMCS for a panel of arbitrators. Moreover, the contract places the burden of applying to the FMCS for a panel of arbitrators on "the parties," not IMC.

19. On December 14, 2001, the Administrator informed IMC by letter that the time limit for filing for arbitration under Step IV had expired, and that IMC was required to reinstate McKnight with back wages in accordance with the terms of the Agreement and the decision of the Committee.

20. A Step III grievance decision of the Committee is treated as final and binding unless timely challenged by the losing party through Step IV arbitration.

21. IMC did not timely challenge the validity of the Committee's decision and order by timely appealing that decision and order to the next step in the contractual grievance procedure, i.e., impartial arbitration.

Defendant excepts to this entire paragraph.

22. IMC did not timely apply to the FMCS for the services of an arbitrator, nor did IMC inform the UA that

it intended to timely initiate arbitration through the FMCS or in any way seek cooperation from the UA in initiating such arbitration through the FMCS.

Defendant excepts to this entire paragraph.

23. IMC refused and continues to refuse to reinstate McKnight and pay him the back wages and benefits he is owed since August 16, 2001.

Defendant acknowledges that it did not file a motion to vacate the Committee's decision, but argues that the proper procedure available to IMC was to appeal the Committee's decision to arbitration, which IMC argues that it did on a timely basis.

24. IMC failed to timely file a motion to vacate the Committee's decision.

On July 2, 2002, UA filed its original complaint, its original motion to confirm contractual grievance award, and its original memorandum in support. On August 1, IMC moved for summary judgment and opposed plaintiff's motion to confirm contractual grievance award. Thereafter, on September 13, 2002, UA moved for summary judgment which was opposed by IMC.

## ARGUMENTS

■ UA argues, very simply, that IMC failed to formally challenge the Committee's decision by way of appeal and pursuant to the terms of the Agreement. UA argues further that IMC failed to file a timely application to the FMCS for the services of an arbitrator. Additionally, UA argues that IMC has refused to honor the decision of the Committee and requests that this court confirm such.

UA also argues that jurisdiction to enforce grievance awards pursuant to the FAA includes the judicial enforcement of decisions made at the intermediate steps of the grievance procedure. Therefore,

the Committee's decision, according to UA, constitutes a final and binding award and that, under the FAA, "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. Because IMC did not seek to vacate the final and binding award, UA argues that IMC is now barred from asserting defenses that should have been raised in such a motion.

Alternatively, UA argues that in suits brought under LMRA § 301(a), 29 U.S.C. § 185(a), the state arbitration statute supplies the period within which a party is suing to vacate a labor arbitration award. The applicable state statute here, UA argues, requires service upon the adverse party within three months after the award is filed or delivered.

IMC argues that it did file a timely appeal to arbitration from the Committee's decision and that the dispute awaits arbitration. Therefore, IMC argues, the grievance is still pending and awaiting arbitration; there is no final decision to "confirm."

In support of its argument, IMC claims that it notified the Committee in writing on October 10 that it was appealing to arbitration. IMC also cites the October 29 letter from the Administrator to IMC referring to the contract provisions dealing with arbitration and stating that it was forwarding a copy of Guitreau's letter to Local 106 "notifying them of your decision to proceed to arbitration." IMC argues that this letter is a written acknowledgment that IMC did indeed appeal the matter to arbitration. IMC argues that on December 3, the Committee again acknowledged in writing that arbitration was open. IMC claims that between October 10 and December 14, the company indicated on three different occasions that it

wanted to proceed to arbitration (in writing on October 10 and December 3, and orally on November 20).

IMC also argues that UA has brought this suit under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* and under § 301 of the LMRA, 29 U.S.C. § 185 which confers upon federal courts jurisdiction over suits for violations of collective bargaining agreements. However, IMC argues that the FAA is inapplicable to UA's suit to "confirm" the decision of the Committee since that decision is not an arbitration award, but rather, a decision by a Committee at an intermediate step in the grievance process. IMC concedes that UA may sue to enforce the provisions of the collective bargaining agreement under § 301 of the LMRA, but argues that UA has not filed a motion for summary judgment or any other motion to decide its § 301 claim on the merits.

## LAW AND DISCUSSION

### Jurisdiction

UA argues that jurisdiction to enforce grievance awards pursuant to the FAA includes the judicial enforcement of decisions made at intermediate steps of the grievance procedure. The Committee's decision, according to UA, constitutes a final and binding arbitration award, and because IMC did not seek to vacate the final and binding award, the defendant is now barred from asserting defenses that should have been raised in such a motion.

Alternatively, UA argues that in suits brought under LMRA § 301(a), 29 U.S.C. § 185(a), the state arbitration statute supplies the period within which a party is suing to vacate a labor arbitration award. The applicable state statute here allegedly requires service upon the adverse party within three months after the award is filed or delivered.

IMC argues that the FAA is inapplicable since the Committee's decision is not an "arbitration award," but rather, an intermediate step in the grievance procedure. Specifically, IMC argues the inapplicability of UA's FAA claim that IMC has waived its defenses to the enforcement of the decision by failing to file a motion to vacate, modify, or correct the award within three months, pursuant to §§ 10–12.

According to *Local 1351 Intern. Longshoremens Ass'n v. Sea–Land Service Inc., Carriers' Container Council,* 214 F.3d 566 (5th Cir.2000), *cert. denied, SL Serv., Inc. v. Office & Prof'l Employees Intern. Union, AFL–CIO,* 531 U.S. 1076, 121 S.Ct. 771, 148 L.Ed.2d 670 (2001), both LMRA and FAA grant jurisdiction over parties who are signatories to a collective bargaining agreement. However, since there has been no award from an arbitrator per se in this case, the court agrees with IMC that the Federal Arbitration Act (FAA), 9 U.S.C. § 9 is inapplicable.

The court need not be concerned with IMC's alleged failure to move to vacate the Committee's award within applicable time limits under LMRA, since again, there has been no arbitration award per se and IMC is not seeking to vacate such. However, a federal district court does have jurisdiction under the LMRA to entertain an action for breach of a collective bargaining agreement. *Pari Mutuel Clerks Union of Louisiana, Local 328 v. Fair Grounds Corp.,* 703 F.2d 913 (5th Cir.1983), *cert. denied, Fair Grounds Corp. v. Pari–Mutuel Clerks Union of Louisiana, Local 328, affiliated with Serv. Employees Intern. Union, AFL–CIO,* 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983). UA's original complaint was to "enforce the terms of a collective bargaining agreement, which constitutes a binding contract between it and the Defendant. Therefore, jurisdiction is conferred on the court by virtue of, Section 301 of the Labor–Management Relations

Act of 1947 (29 U.S.C. § 185), referred to as the LMRA."

In *General Drivers, Warehousemen and Helpers, Local Union No. 89 v. Riss and Co.*, 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963), the union sued when the employer refused to comply with a ruling of the Joint Area Cartage Committee directing that union members be reinstated with full seniority and back pay. The Committee's ruling was handed down in accordance with the grievance procedures established in the collective bargaining agreement. The Court held that "if the award at bar is the parties' chosen instrument for the definitive settlement of grievances under the Agreement, it is enforceable under § 301 [29 U.S.C. § 185]. And if the Joint Area Cartage Committee's award is thus enforceable, it is of course not open to the courts to reweigh the merits of the grievance." *Id.*, 372 U.S. at 519, 83 S.Ct. at 791.

Because the court finds that failure by IMC to perfect an appeal of the Committee's decision makes such decision final and binding, and since IMC has failed to comply with the final and binding decision, it is therefore properly enforceable by this court under 29 U.S.C. § 185. *See Harris v. Edward Hyman Co.*, 664 F.2d 943 (5th Cir.1981) (district court has subject matter jurisdiction over actions to enforce provisions of collective bargaining agreement.)

**The Motions**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of asserting the basis of the motion and demonstrating the absence of a genuine issue of material fact; he need not

negate the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069,- 1075 (5th Cir.1994). Substantive law guides the determination as to which facts are material, and because the issues of material fact must be genuine, the presence of some alleged factual disputes, depending on what they are, will not necessarily defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir.1993), *cert. denied, Turnbull v. Home Ins. Co.*, 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). The movant may discharge his burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554.

Once the movant discharges his burden, the nonmovant must highlight specific facts which demonstrate that there is a genuine issue of material fact, but he may not rely upon allegations or denials of his pleading. Fed.R.Civ.P 56(e); *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.1992), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46. The nonmovant's "burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little*, 37 F.3d at 1075 (citations omitted). There is no genuine issue when the record could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Amoco Prod. Co. v. Horwell Energy, Inc.*, 969 F.2d 146, 148 (5th Cir. 1992). Stated differently, the nonmovant

**1308**

"need only present evidence from which a jury might return a verdict in his favor." *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514. Only then will a genuine issue be considered to exist. The court must resolve all factual inferences in favor of the nonmoving party, but only when the parties have each submitted contradictory factual evidence. *Little,* 37 F.3d at 1075.

In sum, summary judgment is mandated if the nonmovant fails to sufficiently establish the existence of an essential element of his case on which he bears the burden of proof, thereby dispensing with a genuine issue, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322–323, 106 S.Ct. at 2552; *see Little,* 37 F.3d at 1075.

■ IMC was sufficiently notified of the date and place of the Step III meeting, yet the defendant failed to either attend or to submit its position in writing for consideration. The second October 10 letter from Guitreau to Kaczorowski, stating that "we can either present our facts at a rescheduled third step or we can proceed to arbitration... I'll await word from you as to your decision" is insufficient to constitute an appeal. Step III, No. 2 clearly says that "[i]n the event that the *affected Union or Contractor* does not accept the decision of the General Presidents' Committee, *either party* may *appeal* within ten (10) days *to an Impartial Arbitrator.*" (emphasis added). First, the court reads the words of the contract, "either party" to mean the "affected" party unwilling to accept the Committee's decision—IMC. The court agrees with UA that the burden of pursu-

ing appeal is logically vested in the party that actually has a reason to seek appellate review. Second, Kaczorowski was the Administrator, not an Impartial Arbitrator. He was the improper party for IMC to contact in order to secure a valid appeal to arbitration. The court concludes that the contract required IMC to apply to the Mediation and Conciliation Service for an arbitrator if it wanted to pursue its appeal.

The October 10 letter does not constitute a valid appeal under the clear terms of the contract, and IMC failed to timely appeal the Committee's decision within 10 days. The Committee's decision and order stands as final and binding under the terms of the grievance procedure. Arbitration is no longer available to IMC. "[A] court will not order arbitration when the intended preclusive effect of a procedural provision and the fact of breach are both so plain that no rational mind could hurdle the barrier...." *Rochester Tel. Corp. v. Communication Workers of Am.,* 340 F.2d 237, 239 (2nd Cir.1965). Moreover, Kaczorowski's declaration [4] states that

[a] decision rendered at any [s]tep of the grievance procedure is treated as final and binding unless it is appealed to the next [s]tep pursuant to the terms of the Agreement.

According to UA's statement of material facts, No. 20, "[a] Step III grievance decision of the General President's Committee is treated as final and binding unless timely challenged by the losing party through Step IV arbitration." IMC did not except to this statement.

No event subsequent to October 10 amounts to a proper IMC appeal. On

4. Kaczorowski's declaration was made pursuant to 28 U.S.C. § 1746. "It is a settled rule in this circuit that an unsworn affidavit is incompetent to raise a fact issue precluding summary judgment. A statutory exception to this rule exists under 28 U.S.C. § 1746, which permits unsworn declarations to substitute for an affiant's oath if the statement contained therein is made 'under penalty of perjury' and verified as 'true and correct.'" *Nissho–Iwai American Corp. v. Kline,* 845 F.2d 1300, 1306 (5th Cir.1988) (footnote omitted).

October 16, Kaczorowski communicated the Committee's decision to IMC and UA that McKnight be "reinstated with back wages and benefits from August 16, 2001." Having determined that the October 10 letter from IMC to the Administrator did not constitute an appeal to arbitration, it is of no moment whether October 10 or October 16 is considered the date of the Committee's decision—IMC failed to submit an appeal to an Impartial Arbitrator within 10 days of either of those dates.

The October 29 letter to IMC from Kaczorowski reminding IMC of its right to appeal the decision to an impartial arbitrator within ten days and recognizing IMC's "decision to proceed to arbitration" may reference IMC's intent to appeal, but an intent to appeal is not recognized in the Agreement. The Agreement mandates an actual appeal. In any event, October 29 is more than ten days after the rendition of the decision.

The undated letter (written sometime between November 20 and 26) from Local 106 to UA stated that "Guitreau said [per a telephone conversation on November 20, that] he was not going to pay back wages and doctor bills without an arbitration ruling." The Local 106 representative also stated that "I have yet to be contacted on choosing an arbitrator." Here again, IMC's intent to appeal to an arbitrator insufficient to fulfill the terms of the Agreement; therefore, the language of this letter is unconvincing.

On November 26, 2001, UA wrote Kaczorowski, stating that IMC had not contested the decision in a timely manner, and requesting that the Committee enforce its decision. Thereafter, on December 3,

Kaczorowski informed IMC that it had "one of two choices, either reinstate Mr. Dennis McKnight with back wages or *IMMEDIATELY* proceed to arbitration." The court need not determine whether Kaczorowski had the authority to expand the terms of the Agreement so as to allow an appeal to proceed so far beyond the date of the Committee's decision. It is enough for the court that up until December 3, well over a month after the decision date, IMC had failed to appeal to an Impartial Arbitrator. It is of no moment, therefore, that on December 3, IMC wrote to Local 106 stating that it would "proceed to arbitration to settle this issue with Dennis McKnight." By December 3, it was too late.

Kaczorowski's December 14 letter to IMC explaining that "the time limits for filing the arbitration is long passed" was justified since IMC failed to submit the grievance to Step IV in a timely fashion. IMC argues that this letter erroneously assumed that the burden was on IMC to apply to the FMCS for a panel of arbitrators. Guitreau states in his affidavit that there is no established practice or custom between the parties as to who writes to the FMCS for a panel of arbitrators. The court does not reach that question. Because IMC did not make a timely submission of appeal under Step III, the court finds that the terms of Step IV addressing application to the FMCS are not at issue. The court declines to determine either when or which of "the parties" is obligated to apply to the FMCS for an arbitrator.[5]

Whether pursuant to plaintiff's motion to confirm contractual grievance award or its motion for summary judgment, since

---

**5.** The court notes here that although IMC argues that the contract contains no time limits for applying to the FMCS for a panel of arbitrators after an appeal to arbitration is made, Step IV, No. 1 clearly says that "[w]ithin five (5) days after the grievance has been referred to Step IV, the parties shall apply to the United States Mediation and Conciliation Service for the services of an Arbitrator in accordance with established rules of said services."

there are no genuine issues of material fact, the court confirms and enforces the Committee's decision made at Step III of the collectively negotiated grievance procedure. IMC is therefore ordered to reinstate McKnight with back wages and benefits since August 16, 2001.

## CONCLUSION

Accordingly, for the foregoing reasons, the motion for summary judgment by defendant (doc. 9) is hereby **DENIED.** The motion to confirm contractual grievance award (docs. 2, 15) and the cross-motion for summary judgment by plaintiff (doc. 25) are hereby **GRANTED** and judgment shall be entered in favor of plaintiff.